[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action commenced by the Plaintiff husband on January 4, 2000 seeking a dissolution of marriage on the grounds of irretrievable breakdown. He also claims joint custody of the minor children and an CT Page 14608 equitable division of all the assets and liabilities of the parties. On April 24, 2000 the Defendant wife appeared by counsel. The case was claimed to the Limited Contested List because of the parties' inability to resolve financial issues. Trial was held on July 26, 27, and August 28, 29, 2001. Both parties testified and the court also heard testimony from Michael DiPiro, the accountant for the Plaintiff husband's business; Jay Rasmus, a CPA hired by the Defendant to value the Plaintiff's business; and Kenneth Pia, a CPA who is an expert in valuing closely held businesses. The court also received 38 exhibits. From the testimony and evidence presented and after carefully assessing the credibility of the witnesses, the court finds the following to have been proven.
The parties were married on April 30, 1977 in Boyertown, Pennsylvania. The Plaintiff has resided continuously in this state for more than twelve months immediately prior to the date of the complaint. There are two children issue of the marriage, only one of whom is still a minor, Scott D. Schaeffer who was born March 25, 1984. No other minor children have been born to the wife since the date of the marriage. Neither the state of Connecticut nor any town thereof has contributed to the support and maintenance of either party or their children. The court finds that it has jurisdiction over the parties and the marriage.
This is the first marriage for each party. The Plaintiff is 48 years old and the Defendant is 47. The parties met when they were in their early twenties and the husband was in college and the wife was a sales clerk. They dated for four years during which time the wife became an assistant buyer. From the time of their marriage until their first child was born in September 1981, the wife worked as a buyer for Joy Shops, then Deb Shops. When she stopped working she was making $30-35,000 per year. During that time the husband was employed as a laboratory technician for Cermatel making coatings to be used in the air craft industry and earning about $20,000 per year. It was while he worked for Cermatel that he developed a coating formula.
The decision to have children was joint, and, after the birth of their first son, the wife stopped working full-time. She resumed working part-time shortly after his birth. In 1984 their second son was born. In 1986 the parties moved to Connecticut so the Plaintiff could take a job with Chromalloy, a competing coating company. The Defendant secured a part-time job at the Marlboro Country Barn. They bought a house in Hebron. The Defendant continued to work part-time until the children were in high school while she also maintained the home. She started working full-time at Marlboro Country Barn in 1995.
The Plaintiff worked at Chromalloy until 1988 making about $38,000 per CT Page 14609 year. In 1988 the division was sold and he went to work for High Performance Coatings. He worked there until 1994 when he left to start Airborn Coatings. At that time he was earning about $47,000 per year. Airborn Coatings was founded by Jay Barry and initially did powder coatings. Barry wanted to expand into aluminum and ceramic coatings for exhaust systems and a deal was reached between him, the Plaintiff and David Gunis in which they would be equal partners in Airborn. The Plaintiff supplied the formula for the coating, Dave Gunis supplied the financing, and Barry supplied the equipment. At the time of the hearing in this matter, Barry held 49% of the stock of the business, the Plaintiff held 33% and Gunis held 18%. It is the intent of the partners that they are each entitled to one-third of the company and this distribution is only temporary while a loan to the Small Business Administration is outstanding. The Plaintiff is Vice President and Barry is President of the company, but each makes the same salary. The company is a Subchapter S corporation which means that any profit or loss from the business is passed through to the owners for tax purposes and reported in their individual tax returns on Schedule K-1. The Plaintiff's taxes are paid by the Company.
Shortly after the Plaintiff joined Airborn Coatings the business expanded to a second location in Oklahoma City. The Plaintiff's duties were to manage the operations of the East Hartford facility and he continues to do so. In 1997 and 1998 the company expanded in both Connecticut and Oklahoma. In 1999 Airborn Coatings opened another plant in Charlotte, North Carolina to service the race car industry. The North Carolina expansion was financed by a $750,000 Small Business Administration loan to which the Plaintiff is a personal guarantor. The Plaintiff describes Airborn Coatings as being in a growth mode, a young company attempting to expand and diversify. The facility in Connecticut has been expanded twice and the Oklahoma City facility has also been expanded. The company is hoping to expand into Michigan. The Plaintiff is optimistic about the company's future. Because the SBA has tied up much of the company's assets as collateral for their loan, the company is using the cash it generates to finance growth.
The gross receipts of Airborn have increased consistently since its start. In 1996, its gross receipts were $1,342,417 and it had a profit of $50,305. In 1997, the gross receipts were $2,018,831 and the profit was $38,716. In 1998, the company's gross receipts were $2,873,720 with profits of $264,025. In 1999, gross receipts were $3,241,257 with profits of $40,367. The profits in 1999 were substantially effected by the losses incurred in starting the North Carolina plant. In the year 2000 the company's gross revenues were approximately $4,300,359 and its profit was $262,661. The company's statement of income and expenses for June 30, 2001 indicate that for the first six months of this year the company's CT Page 14610 revenues were $2,335,936 and its net profit was $163,657.
The Plaintiff draws a salary of $75,000 from the business. DiPiro notes that the level of officer compensation for Airborn is low compared to other companies with similar revenue. Airborn's is 3.6% while the normal rate is 6.7%. After the Plaintiff separated from his wife in March of 1999 the company paid for his living expenses, i.e., rent and utilities, until December 1999 and this was considered on the books of the company as a loan to the Plaintiff. Substantial payments on that loan were made by the company out of the Plaintiff's accumulated adjustment account — his share of the company's profits for which he has been taxed but which in fact have not been distributed to him. The Plaintiff lists a debt of $21,885 to the company on his financial affidavit which could similarly be paid from his accumulated adjustment account. The value of that account, which he does not list as an asset on his financial affidavit, is, as of the end of 2000, $164,907. In 1999 and 2000 the company paid out of that account $38,520 for the benefit of the Plaintiff. The company also supplies him with a car. The company also pays for a car for the Defendant as well as the taxes, gas, insurance and repairs. The Plaintiff's son also receives a weekly salary from Airborn which he uses to pay for his college tuition.
The Plaintiff lists his net income as $1005 and his expenses at approximately $324 per week before alimony and child support payments. The Plaintiff also has a retirement account valued at $49,000 and savings of approximately $5,300.
The Defendant earns approximately $24,000 per year from her employment at Marlborough Country Barn and her net income is approximately $383 per week. Her expenses, including the mortgage, are approximately $749 per week. This does not include the cost of transportation which she will be required to bear after December 2002 or the cost of medical insurance which will be approximately $200 per month. She has two retirement accounts valued at $37,100 and savings of approximately $3,400.
Although the Plaintiff was taxed on the profits of Airborn, these moneys were not fully distributed to him and much of it was reinvested in the company to support future growth. It is clear, however, that the Plaintiff has access to additional funds from Airborn in addition to his salary. This is apparent from the payment by the company of his living expenses, his and the Defendant's cars and sufficient income to his son to pay for his college tuition.[1] in addition, the company carries on its books a debt to the Plaintiff in the form of an accumulated adjustment account, which can and has been accessed by the Plaintiff to meet his personal financial needs. Thus some of the money in his accumulated adjustment account has, in fact, been distributed to the CT Page 14611 Plaintiff. The court views this distribution of additional moneys to the Plaintiff from Airborn as additional compensation.[2] In two years the Plaintiff received an additional $38,520.[3] This calculates to approximately $370 per week. Since the amounts in the accumulated adjustment account have already been taxed, this is net income. Therefore for purposes of the Child Support Guidelines the court calculates the Plaintiff's net salary as $1,375. Thus the presumptive child support order is $235.
The Plaintiff described the difficulties in the marriage as a difference in goals, they had no savings plan, no goal for retirement and his wife had no time for him. It was a surprise to the Defendant when the Plaintiff told her he was moving out of the marital home which he did in March 1999. The court does not place on either party blame for the cause of the breakup of the marriage.
Conn. Gen. Stat. Section 46b-81 provides that in a dissolution of marriage action "the Superior Court may assign to either the husband or wife all or any part of the estate of the other. In fixing the nature and value of the property, if any, to be assigned, the court. . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . ., the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." Similar criteria apply to the determination of an award of alimony pursuant to Conn. Gen. Stat. Section 46b-82. "`The difference between an assignment of a specific portion of an estate and alimony is in their purposes. Clark, Domestic Relations (1968) § 14.8. The purpose of property assignment is equitably to divide the ownership of the parties' property. . . . On the other hand, periodic and lump sum alimony is based primarily upon a continuing duty to support.' (Citation omitted.) Blake v. Blake, supra,211 Conn. 497-98." Billings v. Billings, 54 Conn. App. 142, 149-150
(1999). The purpose of alimony is to provide for the support of a spouse. Weiman v. Weiman, 188 Conn. 232, 234 (1982).
Airborn was conceived during the term of the marriage and the formula the Plaintiff contributed to Airborn was developed during the term of the marriage and thus the Plaintiff's share of Airborn is clearly an asset of the marriage. The Defendant does not desire any part of the Plaintiff's interest in Airborn but seeks the home located at 8 Charles Lane, Hebron, Connecticut free of the mortgage on the home. The Defendant argues that this would be an equitable allocation of the parties assets. The parties agree that the house's value is $215,000 and the outstanding CT Page 14612 mortgage is $80,000 leaving equity of $135,000. The mortgage will be paid off in about twenty years.
Much testimony was directed to the issue of the value of the Plaintiff's share in Airborn Coatings. The accountant for Airborn, DiPiro, believes that the market value of the Plaintiff's share of the company is $110,000 with the total value of the company being calculated as $545,000. He utilized a capitalization of net earnings approach in determining the value. Under this method the business is valued based on the company's expected earnings, that is, what income it would generate for a potential purchaser. The Defendant's expert accountant, Jay Rasmus, also used a capitalization of net earnings method to value the business. Under his calculation, the company is worth between $1,409,534 and $1,630,174. The Plaintiff's share, discounted by his minority interest and for the lack of marketability, is worth between $278,000 and $323,000.
The difference between the valuation by DiPiro and Rasmus is substantially based on a difference in the growth rate utilized by each. The calculations and other factors used by each expert are substantially the same. DiPiro used a growth rate of 4% while Rasmus utilized 20.70%. If a growth rate of 4% was used by both there would not be a significant difference in the experts' valuations. A growth rate of 4% approximates the rate of inflation and the court believes it is a very conservative estimate of the growth rate for Airborn, a new, growing and expanding company. Therefore the court finds the value of the Plaintiff's interest in Airborn to be $200,000.
It is clear that the Plaintiff's interest in Airborn represents a significant asset to the Plaintiff. In addition, the company has demonstrated continual growth and growth in the future is expected, thus providing the Plaintiff with "the opportunity. . . . for future acquisition of capital assets and income." Distribution to the wife of the house valued at $215,000, with the Plaintiff being responsible for payment of an amount equal to the value of the mortgage to the Defendant, while allowing the Plaintiff to retain his interests in Airborn and Certech (a company which presently has no value) is an equitable division of the parties' property.
As to the Defendant's request for alimony, this is a marriage of over twenty years. The Plaintiff has a college education while the Defendant does not. Both parties are approximately the same age but the Plaintiff, because of his education and the skills he has acquired during the marriage, has significantly greater vocational skills, income, and financial resources at this point, than the Defendant. However, based on the Defendant's previous experience as a buyer, she may be able, over CT Page 14613 time, to move into a more lucrative position. Thus a term of alimony is necessary to provide for the Defendant's support until she is able to acquire the skills and/or income to fully support herself. Both parties agree that alimony should be limited in time although the Plaintiff suggests eight years and the Defendant suggests fifteen. The court believes that a term of twelve years is appropriate.
The wife also seeks an award of attorney's fees. Conn. Gen. Stat. § 46b-62 permits an award of attorney's fees in a dissolution action. Such an award may be based on the parties respective financial abilities and the criteria set forth in Conn. Gen. Stat. § 46b-82. Since the Plaintiff's financial resources are greater than the Defendant's, and the failure to award attorney's fees to the Defendant may undermine the court's other financial orders, the court finds that an award of fees to the Defendant is appropriate. See, Bornemann v.Bornemann, 245 Conn. 508, 543 (1998).
After taking into consideration the criteria required by the statutes and the application of those criteria to the facts found by the court, and the agreement of the parties as to items number 3, 4, 5, 6, 7, 8 below, the court enters the following orders:
 1. A decree is entered dissolving the marriage of the parties on the grounds of irretrievable breakdown, all the allegations of the complaint having been proven.
 2. There shall be joint custody of the minor child, Scott Schaeffer, with primary residence with the Defendant and the Plaintiff shall have reasonable visitation and liberal rights of access. The Plaintiff shall pay the Defendant $235 per week for the support of the minor child until the child graduates from high school or attains the age of nineteen, whichever first occurs.[4]
 3. Each party shall retain the automobile in their possession and the Plaintiff shall be responsible for the lease payments, insurance and taxes for Defendant's vehicle until the lease expires in December 2002. The Defendant shall be responsible for all costs of repairs, maintenance and gasoline.
 4. The Plaintiff shall maintain medical, health and hospitalization insurance as available through his employer for the minor child until he graduates from high school or obtains the age of nineteen, whichever CT Page 14614 first occurs. The parties shall share all unreimbursed medical expenses for him according to the Child Support Guidelines percentage, that is, the Plaintiff shall be responsible for 65% and the Defendant 35%. The provisions of Conn. Gen. Stat. § 46b-84d shall apply.
 5. The Defendant shall be covered by COBRA benefits under the Plaintiff's existing health, medical, and hospitalization policy through the Plaintiff's employer with the Defendant paying the premiums. Each party shall be responsible for their own unreimbursed medical expenses.
 6. Each party shall waive any and all interest, legal or equitable which they may have to the other's bank accounts, stocks, bonds, mutual funds, cash value of life insurance, pension, 401K or other retirement accounts/deferred compensation plans as reflected on each of their Financial Affidavits, except as may be necessary to secure the payment as set forth in Paragraph 10 infra.
 7. The Defendant shall relinquish any and all claims to Plaintiff's shares, interest, rights, title and claims, legal or equitable, which she may have to the business entities Airborn Coatings, Inc. and Certek, Ltd. except as may be necessary to secure the payment as set forth in Paragraph 10 infra.
 8. Pursuant to the agreement of the parties, the Plaintiff shall maintain and pay the premiums on the $250,000 life insurance policy, with the two children and the Defendant named as equal beneficiaries, that is listed on his financial affidavit, as long as he has an alimony obligation.
 9. The Plaintiff shall pay to the Defendant alimony in the amount of $300 per week beginning the date of this judgment for a period of 12 years or until the death of either party, whichever first occurs. Said alimony is non-modifiable as to term.
 10. The Plaintiff shall quit claim his right, title and interest in the marital home at 8 Charles Lane, Hebron, to the Defendant within thirty days. The CT Page 14615 Defendant shall be responsible to pay for the taxes, insurance, maintenance, utilities and upkeep of said residence and shall indemnify and hold the Plaintiff harmless thereon. The Plaintiff shall pay the Defendant, as a property settlement, the sum of $80,000 payable in equal monthly installments of $333. Said sum shall be paid over a period of twenty years with simple interest at the rate of 7%, with the first payment to be made on December 1, 2001. The monthly payments shall be $333 in principle plus $23.33 in interest. The Defendant shall be responsible for the payments on the mortgage on the marital home and shall indemnify and hold the Plaintiff harmless thereon as long as he is current in his alimony payments and the payments toward the $80,000 provided in this paragraph. The Plaintiff shall pledge his one-third interest in Airborn as security for the payment of the $80,000 and his IRA-Vanguard Group listed on his financial affidavit and execute all papers necessary to evidence such pledge prepared by Plaintiff's counsel and provide them to the Defendant's counsel within thirty days. The Defendant may be required, subject to court approval, to subrogate her interest in Airborn if the pledge of such interest is necessary to secure required financing for the company. The Plaintiff may, without penalty of any kind, pay the principal balance due on the $80,000 to the Defendant at any time prior to the expiration of the twenty year period.
 11. The Plaintiff shall pay the family credit card debt incurred prior to the separation of $12,518 and shall indemnify and save the Defendant harmless from any liability for this debt. Each party shall be liable for their own credit card debt after that date. Each party shall assume and pay and hold harmless the other with respect to all other debts listed on his or her Financial Affidavit and the parties agree to hold each other harmless for any debts incurred by the other. All credit cards held in the parties' joint names shall be cancelled within thirty days of the date of judgment.
 12. The parties shall alternate years in which they may claim the minor child for income tax purposes; Defendant to claim the minor child in odd numbered CT Page 14616 years and the Plaintiff to claim the minor child in even numbered years.
 13. The Plaintiff shall pay $2,500 towards the Defendant's attorney's fees within thirty days of this judgment.
Scholl, J.